**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ARTHUR DICKERSON,<br><br>*Plaintiff*,<br><br>v.<br><br>GRANT LEADING TECHNOLOGY, LLC,<br><br>*Defendant.* |

Civil Action No. 23-867 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Arthur Dickerson brings this action against his former employer, Grant Leading Technology ("GLT"), alleging violations of various federal and District of Columbia statutes. Dickerson claims that he was subjected to unlawful discrimination and retaliation on account of his disabilities while employed at GLT. Dickerson originally brought this action in D.C. Superior Court, but GLT removed the action to this Court pursuant to 28 U.S.C. § 1446. *See* Dkt. 1. Now before the Court is GLT's motion to dismiss. Dkt. 6. For the reasons given below, the Court will **GRANT** in part and **DENY** in part GLT's motion.

## I. BACKGROUND

The following factual allegations are taken from Dickerson's complaint, which the Court must take as true for the purposes of GLT's motion to dismiss. *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 67 (D.C. Cir. 2015).

Arthur Dickerson was employed at GLT for roughly two years, from 2019 to 2021. Dkt. 1-1 at 7 (Compl. ¶¶ 19–20). During that time, Dickerson "suffered epileptic seizures, insomnia, depression, and anxiety and panic attacks and an associated mental health diagnosis/disorder, exacerbated by work-related stress and demands," as well as "intractable migraines,"

"gastroenterological complications from prior surgery," and a "cervical and lumbar radiculopathy and lumbar disc herniation." *Id.* at 7–8 (Compl. ¶¶ 21–24). According to Dickerson, these "disabilities and . . . complications related to his disabilities" required him "to miss work and/or telework," limited his "ability to participate in back-to-back meetings," required "periodic rest and/or breaks during the day," and necessitated a "flexible schedule." *Id.* at 8 (Compl. ¶ 25).

At various points in 2019, Dickerson requested disability-related accommodations. In September 2019, he requested the ability to remotely join meetings from his office to avoid a ten-minute walk to a separate building; in December 2019, he requested the ability to sit (rather than stand) during certain meetings. *Id.* at 8–10 (Compl. ¶¶ 26–27, 31). GLT "disregarded" these requests. *Id.* at 9–10 (Compl. ¶¶ 27, 31).

In January 2020, Dickerson requested and received a "telework medical accommodation," which allowed him to work remotely. *Id.* at 11 (Compl. ¶ 32). On March 3, 2020—after Dickerson had been working remotely for several weeks—GLT requested documentation of his disabilities from his physician. *Id.* at 11–12 (Compl. ¶¶ 34–35). Dickerson then provided GLT with a letter from his physician, which advised GLT that Dickerson should be allowed to continue working remotely, and also recommended an "ergonomic workstation, limited driving, limited travel, and a sit to stand desk." *Id.* at 12 (Compl. ¶ 36). "[A]t or about the time Plaintiff provided Defendant with the letter" from his physician, however, the COVID-19 pandemic commenced, rendering Dickerson's requests largely moot. *Id.* at 13 (Compl. ¶ 39). GLT quickly adopted company-wide telework policies and limited travel. *Id.* During his time working remotely, Dickerson alleges that he was given "undesirable" assignments, *id.* at 11 (Compl. ¶ 33), and subjected to "pressure" to attend virtual work meetings during "core work

hours, 8:00 AM – 5:00 PM, often preventing Plaintiff from taking medically necessary work breaks during the day and requiring Plaintiff to attend back-to-back virtual meetings . . . , further exacerbating his disabilities." *Id.* at 13–14 (Compl. ¶¶ 40–41).

Dickerson also claims that he became the target of harassment and reprisal due to his disabilities. *Id.* at 14 (Compl. ¶ 42). He alleges that his coworkers "mock[ed]" him for "wear[ing] sunglasses indoors" due to his "ocular migraines" and that, "during an office Christmas party" in December 2019, his coworkers "purchased [him] a pair of women's sunglasses as a gag gift." *Id.* at 9 (Compl. ¶¶ 28–29). At that same Christmas party, several coworkers remarked that Dickerson appeared "thin" and that Dickerson "should get a plate of food." *Id.* at 10 (Compl. ¶ 30). When GLT management "took no action to stop" these comments, Dickerson became "so embarrassed and uncomfortable that he made a very early exit from the party." *Id.*

Dickerson further alleges that he was denied "more desirable workplace tasks, responsibilities, and associated opportunities for workplace advancement" and was given poor performance reviews "heavily motivated by bias and discrimination." *Id.* at 14, 16 (Compl. ¶¶ 41, 45). At one point in March 2020, a supervisor contacted him to "question [him] about the nature of his disabilities," in a line of questioning that Dickerson contends was "harassing and hostile." *Id.* at 14–15 (Compl. ¶ 43). He filed an internal complaint against the supervisor, but GLT did not act on it. *Id.* at 15 (Compl. ¶ 44). That same month, Dickerson alleges that GLT "lowered" his 2019 Performance Rating and gave him "an arbitrarily low 2020 Performance Evaluation rating." *Id.* at 16 (Compl. ¶ 45).

Over a year later, on June 7, 2021, Dickerson "emailed Defendant advising Defendant that he was ill and/or recovering and that he would be out from work." *Id.* at 17 (Compl. ¶ 50).

Four days later, on June 11, 2021, GLT "terminate[d] Plaintiff's employment, stating [the] basis for this decision as unsatisfactory job performance." *Id.* at 18 (Compl. ¶ 52). Dickerson alleges that prior to his termination, "[i]n or about March or April 2021, [GLT] provided [him] with a 2020 Performance Evaluation affirming" that Dickerson's job performance was "satisfactor[y] and/or above satisfactory." *Id.* at 17 (Compl. ¶ 48).

On September 25, 2022, Dickerson filed a complaint against GLT in the District of Maryland. *See Dickerson v. Grant Leading Technology, LLC*, No. 8:22-cv-02433 (D. Md. 2022). He alleged that GLT violated three D.C. statutes—the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11 *et seq.*; the D.C. Sick Leave Act ("DCSLA"), D.C. Code § 32-531.01 *et seq.*; and the D.C. Family Medical Leave Act ("DCFMLA"), D.C. Code § 32-501 *et seq.*—and two federal statutes—the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; and the Rehabilitation Act of 1973, 29 U.S.C. § 709 *et seq.* After GLT moved to dismiss, Dickerson voluntarily dismissed that action in January 2023, and subsequently filed this action in D.C. Superior Court on March 8, 2023. Dkt. 1-1 at 3. GLT filed a prompt notice of removal pursuant to 28 U.S.C. § 1446, invoking federal question jurisdiction with respect to Dickerson's federal claims and supplemental jurisdiction for his remaining D.C. law claims. *See* Dkt. 1 at 1–3. GLT then moved to dismiss each of the Dickerson's claims under Rule 12(b)(6). Dkt. 6. The matter is now fully briefed and ripe for consideration.

## II. LEGAL STANDARD

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* Although "detailed factual allegations" are not required, the complaint must contain "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court must "assume [the] veracity" of "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, and must "grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged," *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks omitted). The Court, however, need not accept "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### III. ANALYSIS

Dickerson asserts claims under three D.C. statutes and two claims under federal statutes. GLT moves to dismiss his DCHRA and DCFLMA claims (Counts I and III) as time-barred, and the company moves to dismiss his DCSLA, Rehabilitation Act, and FMLA claims (Counts II, IV, and V) for failure to state a claim. The Court will address each argument in turn.

### A.    Counts I and III: DCHRA and DCFMLA

In Counts I and III of the complaint, Dickerson invokes the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11 *et seq.* and the D.C. Family Medical Leave Act ("DCFMLA"). Dkt. 1-1 at 19–24, 26–28 (Compl. ¶¶ 55–73, 86–98). As Dickerson's complaint acknowledges, these statutes have one-year statutes of limitations. *Id.* at 6 (Compl. ¶¶ 13, 15); *see also* D.C. Code § 2-1403.16(a) (providing that an employee must file a DCHRA claim "within one year of the unlawful discriminatory act, or the discovery thereof"); D.C. Code §§ 32-509(a) to -510 (providing that a DCFMLA claim must be filed within one year after the occurrence or discovery of a violation). GLT argues—and the Court agrees—that these claims are time-barred.

The allegations in Dickerson's complaint span from May 2019 until June 11, 2021. Dkt. 1-1 at 8–20 (Comp. ¶¶ 25–65)). Thus, absent tolling, the statutes of limitations with respect to these claims expired on or before June 11, 2022. Dickerson, however, did not file his complaint until March 8, 2023—almost one year after the deadline. *See* Dkt. 1 at 1.

Dickerson contends that his claims are nonetheless timely because, due to the judicial emergency created by the COVID-19 pandemic, the Superior Court for the District of Columbia "suspended, tolled, and extended," all D.C. Code statutes of limitations beginning March 18, 2020. *See* Order, Superior Court of the District of Columbia (amended 3/19/20), at 1, https://perma.cc/377X-QC5F.[1] The Superior Court issued several subsequent orders, which Dickerson interprets as tolling claims "through June 10, 2022." Dkt. 1-1 at 5 (Compl. ¶ 12). Thus, on Dickerson's view, his claims are timely because he filed this action prior to June 10, 2023.

The Court disagrees. In March 2021, the Superior Court ordered that, going forward, "no deadlines and time limits in statutes (including statute of limitations) . . . are suspended, tolled[,] and extended during the period of emergency" in the civil division (with two narrow exceptions that Dickerson does not invoke here: "statutes of limitations on claims subject to a statutory moratorium during a public health emergency" and "the time limits concerning the validity and issuance of writs of restitution"). Order, Superior Court of the District of Columbia (amended 3/20/21), at 3, https://perma.cc/8HB9-57ZR; Dkt. 6-2 at 99. An addendum to a subsequent order explains: "The March 30[, 2021] order generally provides that no deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court are suspended, tolled or

---

[1] The Court takes judicial notice of the Superior Court's tolling orders. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Fragola v. Kenific Grp.*, 2022 WL 1908824, at *3 (D.D.C. June 3, 2022).

extended during the period of emergency" (save the two narrow exceptions).  Addendum to the

General Order Concerning Civil Cases 1 (April 7, 2021), at 1, https://perma.cc/7CM5-WRF2.

Thus, as this Court has previously concluded as to these tolling orders, "[o]n March 30, 2021, the

applicable limitations period began to run again," *Fragola v. Kenific Grp.*, 2022 WL 1908824, at

*3 (D.D.C. June 3, 2022).  The D.C. Court of Appeals has likewise concluded that "the Chief

Judge suspended tolling for civil cases" on "March 30, 2021."  *Tovar v. Regan Zambri Long,

PLLC*, 321 A.3d 600, 616 (D.C. 2024).  That means the one-year statute of limitations for

Dickerson's DCHRA and DCFMLA claims expired on March 30, 2022, at the latest.

Dickerson resists this conclusion by pointing to a July 2022 Order, which references the

previous tolling orders, and states that "suspension, tolling, and extension ends on June 10,

2022."  Order, Superior Court of the District of Columbia (amended 7/29/2022), at 1,

https://perma.cc/4FC4-NFZX.  Dickerson contends that the one-year statutes of limitations

applicable to his DCHRA and DCFMLA claims were tolled until June 10, 2022, and thus did not

expire until June 10, 2023.  Dkt. 1-1 at 5, 7 (Compl. ¶¶ 12, 18).  But, as GLT points out,

Dickerson omits critical language from this July 2022 Order:  it states that the statutes of

limitations were tolled "except as otherwise specified" in the prior orders.  Order, Superior Court

of the District of Columbia (amended 7/29/2022), at 1, https://perma.cc/4FC4-NFZX.  As

explained above, those prior orders specified that all tolling of civil actions had ceased, except as

to the two types of claims inapplicable here.

"[A] statute of limitations is an affirmative defense," and, as such, it is typically resolved

at summary judgment or trial.  *Stewart v. Int'l Union, Sec.*, *Police & Fire Pros. of Am.*, 271 F.

Supp. 3d 276, 280 (D.D.C. 2017).  The defense may "be raised by pre-answer motion under Rule

12(b)," however, if "the facts that give rise to the defense are clear from the face of the

complaint." *Id.* (quoting *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir.

1988)).  Here, the untimeliness of Dickerson's DCHRA and DCFMLA claims is apparent on the

face of his complaint, and because the Court may take judicial notice of the tolling orders, the

Court need not accept Dickerson's arguments that "contradict" those orders.  *Kaempe*, 367 F.3d

at 963.

Finally, Dickerson argues that the Court should equitably toll the statutes of limitations

due to the "confusing nature" of the Superior Court's tolling orders.  Dkt. 9 at 5.  But "[f]ederal

courts cannot apply the doctrine of equitable tolling differently than would the District of

Columbia courts," *Doe v. Exxon Mobil Corp.*, 2022 WL 3043219, at *10 (D.D.C. Aug. 2, 2022),

and aside from the discovery rule and the lulling doctrine (neither of which apply here), "District

of Columbia law does not recognize an equitable tolling exception to the statute of limitations,"

*Johnson v. Marcheta Invs. Ltd. P'shp*, 711 A.2d 109, 112 (D.C. 1998).

The Court will, accordingly, dismiss Counts I and III with prejudice.

**B.    Count V: Rehabilitation Act**

Count V of the complaint alleges that GLT violated the Rehabilitation Act by refusing

"medically necessary reasonable accommodations," subjecting Dickerson to "discrimination,

harassment, insults, and belittlement," and for terminating him "because of his disability."  Dkt.

1-1 at 30–32 (Compl. ¶¶ 110–22).

Section 504 of the Rehabilitation Act provides that no "qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance."  29 U.S.C. § 794(a).  The standards under the

Rehabilitation Act are effectively the same as those under the Americans with Disabilities Act,

*see* 29 U.S.C. § 794(d), and "cases interpreting either are applicable or interchangeable," *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 81 (D.D.C. 2008) (citation omitted). Several theories of liability are cognizable under the Act, including failure to accommodate, disparate treatment, disparate impact, retaliation, and the creation of a hostile work environment. *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 153–54 (D.D.C. 2015).[2]  To state a claim of discrimination under the Rehabilitation Act, a plaintiff must allege (1) that he was a qualified individual with a disability, (2) the Rehabilitation Act applied to his employer, (3) his employer knew of his disability, and (4) that he suffered an adverse employment action because of his disability.  *Congress v. District of Columbia*, 324 F. Supp. 3d 164, 175 (D.D.C. 2018); *see also Husain v. Power*, 630 F. Supp. 3d 168, 195 (D.D.C. 2022).

As an initial matter, the parties dispute the second element—that is, whether the Rehabilitation Act applies to GLT, a private employer.  In general, the Rehabilitation Act "governs employee claims of handicap discrimination against the Federal Government."  *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014).  Private companies, in contrast, are generally liable under the Americans with Disabilities Act, but they may also be liable under the Rehabilitation Act if they receive "Federal financial assistance" that is "extended to such corporation . . . as a whole."  29 U.S.C. § 794(b)(3)(A)(i).  Courts have understood the phrase "as a whole" to refer to federal funding that serves as "general assistance" to the company, as opposed to funding provided for a "specific purpose."  *Collins v. Giving Back Fund* 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6, 2019) (citing S. Rep. 100-64 at *17 (1987)).  A federal bailout provided to prevent a company from going bankrupt, for example, is "general assistance," whereas "[f]ederal

---

[2] While the complaint is not clear as to Dickerson's Rehabilitation Act theory, his opposition brief indicates that he intended to bring three claims:  failure to accommodate, hostile work environment, and retaliation.  *See* Dkt. 9 at 14–17.

aid which is limited in purpose, e.g., Job Training Partnership Act (JPTA) funds, is not considered aid to the corporation as a whole."  S. Rep. 100-64 at *17 (1987).

Dickerson maintains that GLT is covered by the Rehabilitation Act because, during the COVID-19 pandemic, the company accepted a Paycheck Protection Program ("PPP") loan authorized under the CARES Act.  GLT responds that, because these loans are directed primarily towards assisting businesses with payroll, that they do not qualify as assistance to the company "as a whole."  Dkt. 6-1 at 20–23.  Dickerson, in turn, counters that PPP loans are not solely restricted to payroll and can be used by businesses for many other purposes.  Dkt. 9 at 10–11.  This issue appears to be an issue of first impression in this Court, and the few courts that have considered the issue have come out different ways.  *Compare Seklecki v. Ctr. for Disease Control & Prevention*, 635 F. Supp. 3d 15, 25 (D. Mass. 2022) (concluding that CARES Act aid to airlines does not trigger the Rehabilitation Act because it was "assistance designated for the particular purpose of covering payroll expenses"), *with Fernandez v. Bruno Northfleet, Inc.*, 568 F. Supp. 3d 1294, 1300 (S.D. Fla. 2021) (concluding that allegations that a defendant received PPP loans were sufficient to support Rehabilitation Act claims at the pleading stage).  The Court sees no need to wade into this thicket, however.  Even assuming that Dickerson is correct that the PPP created Rehabilitation Act liability, he is mistaken about *when* the Act applies.  For the reasons explained below, the Court concludes that Dickerson's allegations of misconduct within the proper time frame—that is, during the period when GLT was receiving PPP assistance—are insufficient to state a claim.

Dickerson appears to maintain that, by applying for and accepting the PPP loan, GLT opened the door to claims under the Rehabilitation Act not only during the time that the company received that assistance, but also both retroactively and indefinitely going forward.  *See* Dkt. 9 at

9–11, 13–27.  The Court disagrees.  The Rehabilitation Act applies to private entities "receiving" federal funds.  29 U.S.C. § 794(a).  In other words, the Rehabilitation Act applied to GLT "*only during the periods during which the [federal] funds [were] accepted.*"  *Koslow v. Pennsylvania*, 302 F.3d 161, 166 n.3 (3d Cir. 2002) (emphasis added); *accord Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 113 n.2 (2d Cir. 2001*); Sharer v. Oregon*, 581 F.3d 1176, 1180 (9th Cir. 2009); *cf. Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896 & n.1 (D.C. Cir. 1998).  Dickerson alleges that GLT received a PPP loan on May 21, 2020, and that the loan was forgiven "by or before April 2021."  Dkt. 1-1 at 5 (Compl. ¶ 9).  Accordingly, only those events that occurred between May 21, 2020, and April 2021, are relevant for the purposes of Dickerson's Rehabilitation Act claim.  *See DiPietro v. Archbishop Wood High Sch.*, 711 F. Supp. 3d 488, 493 (E.D. Pa. 2024) (concluding that "even if a PPP loan created obligations under the [Rehabilitation Act], those obligations would cease when the government forgives the loan").

This limitation spells trouble for Dickerson's claims.  As noted above, he seems to assert several theories of relief under the Rehabilitation Act, contending that GLT (1) failed to provide him with reasonable accommodations; (2) subjected him to a hostile work environment; and (3) retaliated against him for engaging in a protected employee activity.  The vast majority of the facts alleged in the complaint to support these claims, however, occurred prior to May 21, 2020, and his termination occurred after April 2021, meaning that those events are not actionable under the Rehabilitation Act.

GLT points out—and the Court agrees—that the complaint contains only a handful of relevant allegations within the controlling time frame, none of which is sufficient to state a claim under the Rehabilitation Act.  First, as to his failure-to-accommodate claim, Dickerson alleges that "on several occasions" after March 2020, he requested the accommodation of "work

breaks," but his request was denied.  Dkt. 1-1 at 12–13 (Compl. ¶¶ 37, 40).  In particular, Dickerson alleges that he "engaged in verbal conversations" with GLT management, in which he "informed" management that he was unable to attend "back-to-back meetings" and "requir[ed] a flexible work schedule permitting Plaintiff to take leave and/or breaks during work days."  *Id.* (Compl. ¶ 37); *see also id.* at 13–14 (Compl. ¶¶ 40–41) (same).

Under the Rehabilitation Act, however, "an employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation."  *Lenkiewicz v. Castro*, 146 F. Supp. 3d 46, 51 (D.D.C. 2015) (quoting *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 130 (D.D.C. 2009)).  An employee may substantiate the requested accommodation by providing a doctor's note, but a doctor's note that "say[s] nothing" about the accommodation at issue will not create an obligation for the employer. *Flemmings v. Howard Univ.*, 198 F.3d 857, 861–62 (D.C. Cir. 1999).  Here, Dickerson alleged that he provided GLT with a doctor's note in March 2020, detailing five "medically necessary" accommodations:  "teleworking," "an ergonomic workstation, limited driving, limited travel, and a sit to stand desk."  Dkt. 1-1 at 12 (Compl. ¶ 36).  As described in the complaint, however, the doctor's note "sa[id] nothing" about the accommodation Dickerson says he was denied (i.e., "work breaks").  *Flemmings*, 198 F.3d at 862.  Nor does Dickerson allege that he was denied the other accommodations detailed in the note during the relevant time period.  Thus, taking Dickerson's allegations as true, GLT's failure to provide him with "work breaks" cannot serve as the basis for Dickerson's failure-to-accommodate theory.  And, at any rate, the Court notes that any request for an unpredictable, "work whenever you want schedule" is likely "unreasonable as a matter of law."  *Davis v. George Washington Univ.*, 26 F. Supp. 3d 103, 116 (D.D.C. 2014); *see Carr v. Reno*, 23 F.3d 525, 531 (D.C. Cir. 1994).

Second, Dickerson's hostile-work-environment theory fares no better.  Hostile work environment claims address workplaces that are "permeated" with "discriminatory intimidation, ridicule, and insult."  *Bain v. Off. of Att'y. Gen.*, 648 F. Supp. 3d 19, 60 (D.D.C. 2022) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Here, it is far from clear that the specific incidents that Dickerson identifies would rise to this level.  He alleges, for example, that he was occasionally "mock[ed]" for wearing sunglasses indoors, he received a "gag gift" of women's sunglasses at an office Christmas party, and that his colleagues remarked at the party that Dickerson was thin and that he should "get a plate of food."  Dkt. 1-1 at 9–10 (Compl. ¶¶ 28–30).  But "'[s]imple teasing' or 'offhand comments' do not rise to the level of a hostile work environment."  *Ali v. Pruitt*, 727 F. App'x 692, 697 (D.C. Cir. 2018) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)).  And even putting this difficulty aside, none of the specific events that he identifies occurred within the relevant temporal window.  Beyond those specific events, the complaint merely contains the conclusory allegation that "Defendant subjected Plaintiff to and/or knowingly permitted Defendant's employees and/or FAA employees to subject Plaintiff to harassment, insults, and belittlement because of and/or arising from Plaintiff's disabilities."  Dkt. 1-1 at 14 (Compl. ¶ 42).  If this general allegation is intended to refer to events other than those discussed above, which occurred before GLT received the PPP loan, Dickerson does not say so, and his conclusory allegation that he was subjected to "harassment, insults, and belittlement," *id.*, does not suffice, *see Bain*, 648 F. Supp. 3d at 59 (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).

That leaves Plaintiff's retaliation theory, which must also be dismissed.  Dickerson asserts that "[w]hen [he] could not attend virtual meetings due to his medically necessary accommodation needs, Defendant subjected [him] to adverse employment actions and/or

treatment, including stripping [him] of more desirable workplace tasks, responsibilities, and associated opportunities for workplace advancement."  Dkt. 1-1 at 14 (Compl. ¶ 41); *see also* Dkt. 6-1 at 31–32.  Less desirable assignments are—in the abstract—"a classic and widely recognized example of forbidden retaliation."  *Bain*, 648 F. Supp. 3d at 56 (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006)).  But, again, Dickerson does not allege any specific dates, details, or instances of these alleged adverse actions.  These "formulaic recitation[s] of the elements of a cause of action," devoid of factual development, are not sufficient to state a claim under Rule 12(b)(6).  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Aside from this, the only other event that occurred during the relevant time period (between May 21, 2020, and April 2021) is a conversation with a manager who claimed that he "could not rely on and/or trust" Dickerson to perform his duties because he was sick.  Dkt. 1-1 at 17 (Compl. ¶ 47).  Because this comment is not related to a request for an accommodation, and does not, standing alone, rise to the level of hostile work environment or retaliation, it does not support Dickerson's Rehabilitation Act claim.

The Court will, accordingly, dismiss Count V for failure to state a claim.

## C.    Count IV: Family and Medical Leave Act

In Count IV of his complaint, Dickerson alleges that his termination ran afoul of the federal Family and Medical Leave Act ("FMLA").  The FMLA provides an eligible employee twelve weeks of unpaid leave during any twelve-month period if a "serious health condition" prevents the employee from performing the functions of his or her job.  29 U.S.C. § 2612(a)(1)(D); *see Gordon v. U.S. Capitol Police*, 778 F.3d 158, 160 (D.C. Cir. 2015).  "The FMLA creates two types of claims: interference claims, in which an employee asserts that his

employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C.

§ 2615(a)(1), and retaliation claims, in which an employee asserts that his employer

discriminated against him because he was engaged in activity protected by the Act, *see* 29 U.S.C.

§ 2615(a)(1) & (2)." *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 98 (D.D.C. 2016)

(quoting *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 152 (D.D.C. 2012)).

"To state an FMLA interference claim, a plaintiff must allege facts sufficient to show,

among other things, that (1) he was entitled to take leave because he had a 'serious health

condition,' (2) he gave his employer adequate notice of his intention to take leave, and (3) his

employer denied or otherwise interfered with his right to take leave." *Hodges v. District of

Columbia*, 959 F. Supp. 2d 148, 155 (D.D.C. 2013).  To state a retaliation claim, a plaintiff must

plead "(1) that he exercised rights afforded by the FMLA, (2) that he suffered an adverse

employment action, and (3) that there was a causal connection between the exercise of his rights

and the adverse employment action." *Thomas*, 227 F. Supp. 3d at 99 (quoting *Roseboro v.

Billington*, 606 F. Supp. 2d 104, 109 (D.D.C. 2009)).  Dickerson asserts both theories, *see* Dkt.

1-1 at 28–29 (Compl. ¶¶ 104–08), but because he fails to allege that he was experiencing a

"serious health condition" when he informed GLT he would be "out from work," *id.* at 17

(Compl. ¶ 50), neither theory can survive the pending motion to dismiss.

Nowhere does the complaint allege that Dickerson suffered from a "serious health

condition," nor does it purport to meet the statutory definition.  Dickerson repeatedly references

his "disabilities," but a "disability" under the Rehabilitation Act and a "serious health condition"

under the FMLA "are different concepts, and must be analyzed separately."  29 C.F.R.

§ 825.702(b); *see also Moskowitz v. Wash. Metro. Area Transit Auth.*, 2021 WL 6841843, at *9

(D.D.C. Mar. 10, 2021) ("Because the statutes simply use different standards, stating that

someone qualifies under the Rehabilitation Act is insufficient to enable the Court to discern whether [their] particular condition also qualifies under the FMLA statute.").

Under the FMLA, an illness qualifies as a "serious health condition" if it involves either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Dickerson does not allege that he received inpatient care, and so he must plead that he required "continuing treatment." FMLA regulations in turn define "continuing treatment" as, among other things, "[i]ncapacity and treatment,"[3] which is further defined as a period of incapacity of more than three consecutive days *and* either of the following:

(1)     [In-person] [t]reatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider . . . ; or

(2)     [In-person] [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(a)(1), (2); *see also id*. § 825.115(a)(3) (requiring "in-person visit to a health care provider"). The term "incapacity" is defined to mean an "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.* § 825.113(b). Dickerson adequately alleges the first element: the complaint indicates that he was incapacitated for more than three days. Dkt. 1-1 at 17–18 (Compl. ¶¶ 49–52) (alleging that Dickerson was terminated four days after informing GLT "he

---

[3] Dickerson also fails to specify which definition of "continuing treatment" would apply to him. *See* Dkt. 1-1 at 17–18, 29 (Compl. ¶¶ 49–54, 105); 29 C.F.R. § 825.113(a)–(e). The Court concludes that the provision governing "[i]ncapacity and treatment" is the most plausible in light of Dickerson's description of his illnesses.

would be out from work arising from his illness"). He fails, however, to allege facts sufficient to support the second element.

Dickerson alleges that, on June 7, 2021, he "suffered an episodic flare up arising from and/or related to his disabilities for which [his] physician recommended [that he] take several days of medical leave," and that he "emailed [GLT] advising [the company] that he was ill and/or recovering and that he would be out from work [due to] his illness." Dkt. 1-1 at 17 (Compl. ¶¶ 49–50); *see also id.* at 29 (Compl. ¶ 105). He also alleges that since May 2019, he has suffered from various conditions, including epileptic seizures, depression, anxiety, intractable migraines, gastroenterological complications from an earlier surgery, and cervical and lumbar radiculopathy and lumbar disc herniations, and he alleges that he received ongoing treatment for some—but not all—of these conditions. *Id.* at 7-8 (Compl. ¶¶ 21–24). He does not allege, however, he obtained in-person treatment from a healthcare provider "two or more times, within 30 days of the first day of incapacity" or that he obtained in-person care "result[ing] in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.115(a)(1), (2). Rather, Dickerson alleges only that he "suffered an episodic flare up arising from and/or related to his disabilities"—without identifying which of his disabilities caused the flare up—and that his physician initially "recommended Plaintiff take several days of medical leave." Dkt. 1-1 at 17 (Compl. ¶ 49). Thereafter, Dickerson did not report to work, and was terminated four days later. Because Dickerson does not adequately allege that he was experiencing an FMLA-qualifying condition, these allegations are insufficient to withstand a motion to dismiss. *See Hodges*, 959 F. Supp. 2d at 156–57 (holding that plaintiff sufficiently pleaded he had a "serious medical condition" by specifically alleging that "he was incapacitated

for a period of more than three consecutive days . . . and underwent treatment at least twice in the thirty days after that date").

Dickerson's failure to allege a qualifying condition also raises a second, similar deficiency:  Dickerson does not allege that he provided "adequate notice" to GLT that he intended to take FMLA leave.  *Hodges*, 959 F. Supp. 2d at 155.  An employee seeking leave must at least provide "sufficient information for an employer to reasonably determine whether the FMLA may apply."  29 C.F.R. § 825.303(b).  A plaintiff need not say "magic words" or describe their condition in detail, but merely "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act."  *Id.*  Notably, Dickerson does not allege that he informed GLT of his doctor's recommendation that he take leave.  Although some of the conditions Dickerson suffered from may have qualified, his vague email to GLT, merely stating that he was "ill and/or recovering and that he would be out from work," Dkt. 1-1 at 17 (Compl. ¶ 50), did not provide the company with "a reason to differentiate the absence from ordinary sick days," *Brown v. Kan. City Freightliner Sales, Inc.*, 2010 WL 3258301, at *2 (8th Cir. 2010).

To be sure, Dickerson alleges that GLT "had knowledge" of his illnesses and that his "leave arising therefrom was directly caused by and/or related to his disabilities."  Dkt. 1-1 at 17 (Compl. ¶ 50).  Dickerson plausibly alleges that GLT had general knowledge of his multiple health issues, but GLT had no way of knowing which of these conditions rendered Dickerson unable to work in June 2021 or, relatedly, whether the FMLA applied to his request for leave. This is especially so because, as GLT points out, Dickerson's most recent request for an accommodation was over one year earlier—in March 2020.  *See id.* at 14–15 (Compl. ¶ 43). Dickerson does allege that, in "early 2021," his supervisor remarked that, "because [Dickerson]

18

was sick, [he] could not rely on and/or trust that [Dickerson] could perform his work duties." *Id.* at 17 (Compl. ¶ 47). Dickerson's response, however, was that his illnesses "in no way hindered or prevented" him from "performing all essential functions of his job duties." *Id.* In light of this, and taking Dickerson's allegations as true, Dickerson did not provide GLT with "sufficient information" for it to reasonably determine whether the FMLA applied in this circumstance.

Because Dickerson does not allege the essential elements of an FMLA interference or retaliation claim, the Court will dismiss Count IV for failure to state a claim.

**D.    Count II: DCSLA**

Finally, Dickerson alleges in Count II that GLT violated the D.C. Sick Leave Act. Dkt. 1-1 at 24–25 (Compl. ¶¶ 74–85). The D.C. Sick Leave Act entitles eligible employees to use accrued paid leave for physical or mental illness. D.C. Code § 32-531.02. Under the Act, an employer may "not interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided by [the Act]," nor may it "discharge or discriminate in any manner against an employee because the employee . . . uses paid leave provided under [the Act]." *Id.* § 32-531.08(a), (b)(4).

As with his FMLA claim, Dickerson alleges both interference and retaliation. *See* Dkt. 1-1 at 24–25 (Compl. ¶¶ 80, 82). The Court concludes that Dickerson's interference claims, however, are insufficient. Dickerson does not allege that he was ever denied sick leave, nor does he allege any *facts* suggesting that GLT interfered with his attempts to take sick leave. Dickerson's conclusory assertion that GLT "tease[d], embarrass[ed], marginalize[d], and/or belittle[d] [him] for needing, requesting, and/or taking sick leave," *id.* (Compl. ¶ 80), is precisely the type of "formulaic recitation of a cause of action's elements" the Supreme Court has said cannot survive a motion to dismiss, *Twombly*, 550 U.S. at 545.

Dickerson's retaliation claim, in contrast, is sufficient to survive a motion to dismiss. "To state a claim of retaliation under the [Sick Leave] Act, a plaintiff must allege that (1) he engaged in statutorily protected activity, (2) his employer took an adverse personnel action against him, and (3) a causal connection between the two exists." *Donner v. Fox News Network, LLC*, 2024 WL 1758689, at *12 (D.D.C. Apr. 24, 2024). Drawing all inferences in Dickerson's favor, the Court concludes that Dickerson has (just barely) alleged these three elements: (1) he advised GLT he was "ill" and "would be out from work arising from his illness;" (2) GLT terminated him while he "was out on sick leave;" and (3) his termination was "caused by" his request for sick leave. Dkt. 1-1 at 17–18, 25 (Compl. ¶¶ 50–51, 81–82).

GLT argues that Dickerson has not stated a claim under the D.C. Sick Leave Act because he does not "offer any causal connection between the June 2021 use of sick leave and Defendant's decision to terminate his employment." Dkt. 10 at 27–28. Although a close question, the Court disagrees. Dickerson was terminated four days into his sick leave, and this "'close temporal connection between the protected activity and the adverse action' can give rise to a reasonable inference of causality." *Donner*, 2024 WL 1758689, at *12 (quoting *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 43 (D.D.C. 2008)). In addition, although Dickerson's allegations regarding his performance evaluations are somewhat inconsistent, *see* Dkt. 1-1 at 16, 17 (Compl. ¶¶ 45, 48), he does allege that shortly before he was terminated, he received an evaluation stating that he was performing his job duties "satisfactorily and/or above satisfactory" and that he received a raise, *id* at 17 (Compl. ¶ 48).

GLT also suggests that Dickerson has not stated a claim for retaliation because the stated reason for Dickerson's termination was "unsatisfactory job performance," Dkt. 6-1 at 38, and "[w]hen an employer terminates an employee after medical leave commences for reasons

unrelated to the sick leave, the employer does not violate the [Sick Leave Act]," Dkt. 10 at 28

(quoting *Ruifang Hu v. K4 Sols., Inc.*, 2020 WL 1189297, at *10 (D.D.C. Mar. 12, 2020)).  GLT

may eventually be able to show that Dickerson was terminated for poor performance, but at the

motion to dismiss stage, the Court must take Dickerson's well-pleaded allegations as true.

Should this case proceed to summary judgment and/or trial, GLT will have the opportunity to

"provide[] a non-retaliatory reason for termination."  *Sobot v. Clean the World Found. Inc.*, 2024

WL 4119389, at *6 (D.D.C. Sept. 9, 2024) (granting summary judgment to defendant on

retaliatory termination claim under the Sick Leave Act).  That question, however, is for another

day.

## CONCLUSION

For the foregoing reasons, GLT's motion to dismiss is **GRANTED** as to Counts I and III

with prejudice and Counts IV and V without prejudice.  GLT's motion to dismiss is **DENIED** as

to Count II.  Dickerson may file an amended complaint within 21 days of this Order.  If

Dickerson does not file an amended complaint repleading his federal claims, Dickerson shall,

within 21 days of this Order, file a brief regarding whether the Court should remand his

remaining state law claim to Superior Court.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 15, 2024